## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 06 2020, 9:11 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jane Ann Noblitt
Columbus, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Myriam Serrano
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Gerardo Hurtado, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | May 6, 2020 <br><br> Court of Appeals Case No. 19A-CR-2345 <br><br> Appeal from the Bartholomew Superior Court <br><br> The Honorable Kathleen Tighe Coriden, Judge <br><br> The Honorable Jack A. Tandy, Senior Judge <br><br> Trial Court Cause No. 03D02-1703-F6-1536 |

**Altice, Judge.**

# Case Summary

[1] Following a jury trial, Gerardo Hurtado was convicted of resisting law enforcement as a Level 6 felony. On appeal, he argues that the State failed to present sufficient evidence to rebut his defense of duress.

[2] We affirm.

# Facts & Procedural History

[3] The facts most favorable to Hurtado's conviction follow. Around 7:00 a.m. on March 11, 2017, Bartholomew County Sheriff's Deputy Kevin Abner was on routine patrol traveling southbound in the left lane of US 31, a four-lane divided highway, at a speed of approximately 55 mph. Deputy Abner observed a grey-colored vehicle approaching from behind in the right lane at a fast speed. As the vehicle passed Deputy Abner, the driver, later identified as Hurtado, gave Deputy Abner a "thumbs up." *Transcript Vol. 2* at 182. Deputy Abner pulled in behind Hurtado and determined that Hurtado was driving approximately 70 mph in a 55-mph zone. Deputy Abner turned on his emergency lights to initiate a traffic stop, but Hurtado continued driving. Deputy Abner then turned on his siren. Hurtado did not pull over, but rather changed lanes to pass slower traffic. Hurtado eventually came to a stop in the left lane at a red light. Deputy Abner got out of his car and ordered Hurtado, whose window was down, to shut off the car's engine. Hurtado turned and looked at Deputy Abner and said, "no I'm good" and gave him a "thumbs up" again. *Id*. at 183. When the light turned green, Hurtado took off. Deputy Abner got back in his car and

continued to follow Hurtado through Columbus. When Hurtado came to a stop at another red light, Deputy Abner got out of his vehicle and again ordered Hurtado to shut off his car. Without responding, Hurtado took off when the light turned green.

[4] By this time, Deputy Nick Martoccia had pulled in behind Deputy Abner, and they both followed Hurtado with their lights and sirens activated. Four officers with the Columbus Police Department had set up to help stop Hurtado by placing tire deflation devices in Hurtado's lane of travel. As Hurtado approached this, he slowed down, made a U-turn, and headed north in the southbound lanes of travel. After he passed a lane divider, Hurtado moved over to the northbound lanes. Two sheriff's deputies and four Columbus police officers in six different vehicles pursued Hurtado with their lights and sirens activated as he drove north on US 31. Columbus Police Officer Andrew Plank was directly behind Hurtado and observed that Hurtado was driving erratically, changing lanes without signaling, driving at speeds up to 93 mph, and driving through red lights. When Hurtado turned onto the ramp for I-65, the police pursuit was terminated for safety reasons.

[5] Approximately thirty minutes later, Hurtado was involved in a car accident in Columbus. A witness to the accident described how Hurtado "flew past" her in the left lane, ran the red light at which she was stopped, and "T-boned" a car that was going through the intersection. *Id*. at 208. The witness estimated that Hurtado was driving about 50 mph when he entered the intersection against the red light.

[6] Officer Plank testified that he came upon "a serious accident" involving a gold vehicle and Hurtado's vehicle. *Id*. at 228. Officer Plank first determined that the driver of the gold vehicle was seriously injured and called for an ambulance. Officer Plank then knocked on Hurtado's window and asked if he was okay. Hurtado did not respond, but instead sat "kind of emotionless, kind of rocking back and forth." *Id*. at 229. The car door was locked, so Officer Plank asked Hurtado to open the door, but Hurtado did not comply.

[7] Columbus Police Officers John Velten and Chris Clapp were dispatched to the accident scene. The officers approached Hurtado's vehicle and ordered him to get out of his car. When he did not comply, Officer Clapp used his baton to break the front passenger window and unlock the doors. When the officers opened the doors, Hurtado said, "come on Mother F*ckers." *Id*. at 231. Hurtado continued to ignore verbal commands to exit the vehicle. After an officer removed Hurtado's seat belt, Hurtado grabbed the steering wheel such that the officers were unable to remove him from the car. Officer Clapp then deployed his Taser, but it was ineffective. It took five officers to physically remove Hurtado from the car. Once on the ground, Hurtado rolled onto his stomach and placed his hands under his torso. The police "got into a tug of war trying to get his hands out from underneath him." *Id*. at 143. After Officer Clapp delivered several baton strikes to Hurtado's shoulder, the other officers were able to free Hurtado's hands and place him in handcuffs.

[8] On March 15, 2017, the State charged Hurtado with Count I, causing serious bodily injury while operating a vehicle with a schedule I or II substance in the

body, a Level 6 felony; Count II, resisting law enforcement by a vehicle, a Level 6 felony; Count III, criminal recklessness, a Level 6 felony; and Count IV, resisting law enforcement, a Class A misdemeanor. On September 25, 2017, the State moved to dismiss Count III, which the trial court granted. On January 29, 2019, the State moved to dismiss Count I due to unavailability of an essential witness, which the trial court also granted. A jury trial on the two resisting law enforcement charges was held August 15-16, 2019.

[9]     As his defense, Hurtado claimed that he was acting under duress. He testified that he lives in northwest Indiana and was in Columbus to handle an issue related to his adult son, who was in a hospital there. Hurtado maintained that he did not agree with the plan of care for his son and was looking to have his son transferred. Hurtado testified that his mother had contacted the police, which led him to believe that the police were going to help him. As to the specific day in question, Hurtado testified that he had come to town to get his son and had parked in a parking lot outside a radio station. Several police officers arrived and instructed him to move to a different location. Hurtado then went to a Village Pantry, where a store employee asked him to leave because he was being too loud. Hurtado testified that in the parking lot outside the Village Pantry, he "almost got shot and killed by three (3) gunman," who he described as law enforcement or military type individuals. *Transcript Vol.* 3 at 27. Hurtado maintained that a police officer arrived at the Village Pantry and asked him to leave town. Hurtado headed north but stopped at a Flying J gas station, where he claims he was approached by a police officer and a sheriff,

who offered to help him. Hurtado did not know where the officers were from but maintained that they followed him back to Columbus. Hurtado testified that the police did a "switcheroo" on him and, at some point, Deputy Abner began following him rather than the officers with whom he had spoken at the Flying J. *Transcript Vol. 3* at 26. Hurtado explained that he did not stop when Deputy Abner turned on his lights and sirens because he was in "fight or flight" mode and "concerned for [his] life" given what had happened to him hours earlier at the Village Pantry. *Id*. at 28. Hurtado also testified that he did not stop because an eighty-year-old man had told him that he did not trust the police in Columbus. Hurtado also explained that he refused to get out of the car following the accident because, a police officer had a gun pointed at him and he feared for his life.

[10] Upon Hurtado's request, the trial court instructed the jury on the defense of duress. The jury ultimately found Hurtado guilty of resisting law enforcement by a vehicle, a Level 6 felony, and not guilty of resisting law enforcement as a Class A misdemeanor. The trial court entered a judgment of conviction and sentenced Hurtado to two years, all suspended except for 213 days for time served. Hurtado now appeals. Additional facts will be provided below as necessary.

# Discussion & Decision

[11] Hurtado argues that the State failed to present sufficient evidence to rebut his defense of duress, and therefore, his conviction must be reversed. On review, the same standard applies as with other challenges to the sufficiency of the

evidence. *Gallagher v. State*, 925 N.E.2d 350, 353 (Ind. 2010). We will affirm the conviction if the probative evidence and reasonable inferences drawn from that evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. *Id*.

[12] Ind. Code § 35-41-3-8(a) provides in relevant part that it "is a defense that the person who engaged in the prohibited conduct was compelled to do so by threat of imminent serious bodily injury to himself or another person." "The compulsion that will excuse a criminal act must be clear and conclusive." *Murrell v. State*, 960 N.E.2d 854, 857 (Ind. Ct. App. 2012). Furthermore, that compulsion must arise without the negligence or fault of the defendant claiming such defense. *Id*. The alternative with which the defendant is faced must be instant and imminent. *Id*. Additionally, per the language of the statute, "[c]ompulsion under this section exists only if the force, threat, or circumstances are such as would render a person of reasonable firmness incapable of resisting the pressure." I.C. § 35-41-3-8(a).

[13] Hurtado argues that his testimony demonstrates he was acting under duress when he failed to stop for Deputy Abner and later led six police officers on a high-speed chase. He also asserts that "[i]f his defense of duress was convincing as to [the Class A misdemeanor resisting offense], then it should have been just as convincing as to [the Level 6 felony resisting offense]." *Appellant's Brief* at 21.

[14] Here, on cross-examination, the State repeatedly asked Hurtado if he had been threatened by any police officers, but Hurtado was unresponsive to this line of

questioning. While repeatedly stating that his life had been threatened, Hurtado never identified any of the officers involved in the police chase as being the source of any of those threats. He testified only that "[t]he fight or flight mechanism is part of how we are wired" and maintained that he did not want to fight the police. *Transcript Vol. 3*. at 33. Moreover, even if he was threatened by armed individuals at a Village Pantry and then later assisted by officers, there is no evidence that hours later, Hurtado feared for his life when, after Hurtado passed Deputy Abner, Deputy Abner attempted to pull him over for speeding. In other words, the State presented evidence from which the jury could have determined that a reasonable person would not have believed that Deputy Abner's attempt to pull Hurtado over for speeding presented a threat of imminent serious bodily injury. The State presented sufficient evidence to rebut Hurtado's claim of duress as it pertained to his conduct giving rise to his Level 6 felony resisting law enforcement conviction.

[15] The verdict of not guilty for the Class A misdemeanor offense does not necessarily mean that the jury accepted his defense of duress. Even if the jury did accept his claim of duress as it related to his conduct following the accident, such does not mean that the jury was obligated to have found that he acted under duress when he failed to stop for Deputy Abner. *See Beattie v. State*, 924 N.E.2d 643 (Ind. 2010) (holding that where there is sufficient evidence to support a jury's verdicts, we will not review such verdicts for inconsistencies).

[16] Judgment affirmed.

Bailey, J. and Crone, J., concur.